## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ROSE COULTER-OWENS, individually and on behalf of all others similarly situated,<br><br>           Plaintiff,<br><br>   v.<br><br>RODALE, INC., a Pennsylvania corporation,<br><br>           Defendant. | Case No.: 2:14-cv-12688<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Rose Coulter-Owens brings this Class Action Complaint and Demand for Jury Trial against Defendant Rodale, Inc. to obtain redress for all persons injured by Rodale's intentional and unlawful disclosure of Plaintiff's and its other subscribers' highly personal and sensitive information. Plaintiff, for her Class Action Complaint, alleges as follows upon personal knowledge as to herself and her own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by her attorneys:

### NATURE OF THE CASE

1.       Rodale publishes some of the most widely circulated magazines in the United States, including *Men's Health*, *Women's Health*, *Runner's World*, and *Prevention*.

1

2.     To supplement its sales and advertising revenues, Rodale also sells its subscribers' personal information—including their full names, titles of magazines subscribed to, and home addresses (collectively "Personal Reading Information"), as well as myriad other personal, lifestyle, and demographic information such as gender, age, ethnicity, income, net worth, religion, parental status, charitable donations, and even health conditions—to data miners and other third parties.

3.     Rodale's disclosure of such personal, demographic, and lifestyle information is problematic because it allows for highly specific targeting of groups of individuals. For example, anyone could buy from Rodale a customer list with the names and addresses of all *Prevention* subscribers who are single, over age 80, own homes, suffer from arthritis, and donate to international aid groups.

4.     While Rodale profits handsomely from such practices, it does so at the expense of its subscribers' privacy rights—Rodale does not obtain its customers' consent prior to selling their Personal Reading Information.

5.     By selling its customers' Personal Reading Information without their consent, Rodale not only disregards its customers' privacy rights, it also violates Michigan's Video Rental Privacy Act, M.C.L. § 445.1712 ("VRPA"), which prohibits companies from disclosing without permission any record or information concerning a customer's purchase of written materials, if the record identifies the customer.

6.     Accordingly, Plaintiff brings this Class Action Complaint against Rodale for its intentional and unlawful disclosure of its customers' Personal Reading Information in violation of the VRPA, for breach of contract, and, in the alternative to breach of contract, for unjust enrichment.

## PARTIES

7.     Plaintiff Rose Coulter-Owens is a natural person and citizen of the State of Michigan.

8.     Defendant Rodale, Inc. is a Pennsylvania corporation with its principal place of business at 400 South Tenth Street, Emmaus, Pennsylvania 18098. Rodale conducts business throughout this District, the State of Michigan, and the United States.

## JURISDICTION AND VENUE

9.     This Court has personal jurisdiction over Rodale because it is registered to do, and regularly does, business in Michigan, including soliciting business from, and entering into transactions with, Michigan consumers. Further, the unlawful conduct alleged in the Complaint occurred in, was directed at, and/or emanated from, Michigan.

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because at least one Class member is a citizen of a different state than Defendant, the amount in controversy exceeds $5,000,000.00, exclusive

3

of interest and costs, and none of the exceptions under that subsection apply to this action.

11.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claim occurred in this District. 28 U.S.C. § 1391(b)(2). Venue is additionally proper because Plaintiff Coulter-Owens resides within this District (in Lapeer County, Michigan), and Defendant conducts significant business in this District, including soliciting consumer business and entering into consumer transactions.

## FACTUAL BACKGROUND

### *Michigan's Video Rental Privacy Act*

12.     In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and written materials offer "a window into our loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

13.     Recognizing the need to further protect its citizens' privacy rights, Michigan's legislature enacted the VRPA "to preserve personal privacy with respect to the purchase, rental, or borrowing of certain materials," by prohibiting

companies from disclosing certain types of sensitive consumer information. H.B.

No. 5331, 1988 Mich. Legis. Serv. 378 (West).

14.   Section 2 of the VRPA states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . *shall not disclose* to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

M.C.L. § 445.1712 (emphasis added).

15.   Michigan's protection of reading information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought. The whole process of intellectual growth is one of privacy—of quiet, and reflection. This intimate process should be protected from the disruptive intrusion of a roving eye." S. Rep. No. 100–599, at 6 (Statement of Rep. McCandless).

16.   As Senator Patrick Leahy recognized in proposing the Video and Library Privacy Protection Act (later codified as the Video Privacy Protection Act, 18 U.S.C. § 2710), "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988).

5

17.     Senator Leahy also explained why choices in movies and reading materials are so private: "These activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id.*

18.     Michigan's passage of the VRPA also established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter." *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (attached hereto as Exhibit A).

19.     Despite the fact that thousands of Michigan residents subscribe to Rodale publications, Rodale disregards its legal responsibility by systematically violating the VRPA.

### The Personal Information Market: Consumers' Personal Information Has Real Value

20.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike

6

anything we've ever seen in our life . . . [and] individuals are concerned about being defined by the existing data on themselves."[1]

21.     More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[2]

22.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. *Data is currency. The larger the data set, the greater potential for analysis—and profit.*[3]

23.     In fact, an entire industry exists where companies known as data miners purchase, trade, and collect massive databases of information about consumers. Data miners then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[4]

---

[1]     The Information Marketplace: Merging and Exchanging Consumer Data (Mar. 13, 2001), http://www.ftc.gov/bcp/workshops/infomktplace/transcript.htm (last visited Mar. 14, 2013).

[2]     *See* Web's Hot New Commodity: Privacy, WSJ.com (Feb. 27, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274 .html (last visited Mar. 14, 2013).

[3]     Statement of FTC Commissioner Pamela Jones Harbour, http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf (Mar. 14, 2013). (emphasis added).

[4]     *See* Martha C. White, *Big Data Knows What You're Doing Right Now*,

24.     The scope of data miners' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[5]

25.     Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[6]

26.     Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.[7]

---

TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited Mar. 14, 2013).

[5]     Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html (last visited Mar. 14, 2013).

[6]     Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c.

[7]     *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Congressman Ed Markey (July 24, 2012), http://markey.house.gov/press-release/bipartisan-group-

27.    In their letter, the co-Chairmen recognized that:

> [t]he business of data brokerage, namely the collecting, assembling, maintaining, and selling to third-parties of consumers' personal information, has grown into a multiple billion dollar industry. *By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer*. This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[8]

28.    Data mining is especially troublesome when consumer information is sold to direct-mail advertisers. In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams,[9] including fraudulent sweepstakes, charities, and buying clubs. Thus, when companies like Rodale share information with data miners and direct-mail advertisers, they contribute to the "[v]ast databases of names and personal information" that are often "sold to thieves by large publicly

---

lawmakers-query-data-brokers-about-practices-involving-consumers%E2%80%99 (last visited Mar. 14, 2013).

[8]    Letter from Edward J. Markey and Joe Barton, co-Chairmen, Congressional Bi-Partisan Privacy Caucus, to Scott E. Howe, Chief Executive Officer, Acxiom (July 25, 2012) (available at http://markey.house.gov/sites/markey.house.gov/files/documents/Axciom%20letter .pdf) (emphasis added).

[9]    *See Prize Offers: You Don't Have to Pay to Play!*, Federal Trade Commission, http://www.ftc.gov/bcp/edu/pubs/consumer/telemarketing/tel17.shtm (last visited Mar. 14, 2013).

traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[10]

29.    Information disclosures like Rodale's are particularly dangerous to the elderly. "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[11] The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[12]

30.    Indeed, an entire black market exists where the personal information of vulnerable elderly Americans is exchanged. Thus, information disclosures like Rodale's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[13]

---

[10]    Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times, May 20, 2007 at A1.

[11]    *Id.*

[12]    *Fraud Against Seniors: Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* http://www.ftc.gov/os/2000/08/agingtestimony.htm (last visited Mar. 14, 2013).

[13]    *See id.*

31.    Rodale is not alone in jeopardizing its subscribers' privacy and well-being in exchange for increased revenue: disclosing subscriber information to data miners, direct marketers, and other third parties is a widespread practice in the publishing industry.

32.    Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

### Consumers Place Monetary Value on their Privacy and Consider Privacy Practices when Making Purchases

33.    As the data mining industry has grown, so too have consumer concerns regarding the privacy of their personal information.

34.    A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[14] As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[15]

---

[14]    *See 2013 TRUSTe US Consumer Confidence Index*, TRUSTe, http://www.truste.com/us-consumer-confidence-index-2013/ (last accessed Mar. 14, 2013).

[15]    *Id.*

35.     Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.

36.     In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[16]

37.     These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data. Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[17]

---

[16]     *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited Mar. 14, 2013).

[17]     *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited Mar. 14, 2013).

38.    Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[18] As such, where a business offers customers a service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a service of less value than the service paid for.

### *Rodale Unlawfully Sells its Subscribers' Personal Reading Information*

39.    Rodale maintains a vast digital database comprised of its subscribers' Personal Reading Information. Rodale discloses its subscribers' Personal Reading Information to data mining companies including Acxiom, Ethnic Technologies, and others, who then supplement that information with additional sensitive personal information about each Rodale subscriber, including gender, age, ethnicity, income, net worth, religion, charitable donations, health conditions, and even whether the subscriber has children living at home. (*See*, *e.g.*, Exhibits B and C.)

40.    Rodale then sells its mailing lists—which include subscribers' Personal Reading Information identifying which individuals purchased which magazines, and can include the sensitive information obtained from data miners—

---

[18]    *See* Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Mar. 2003) at 2, *available at* http://128.118.178.162/eps/io/papers/0304/0304001.pdf (last visited Mar. 14, 2013) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.").

to data miners, other consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts. (*See* Exhibits B – E.)

41.     As a result of Rodale's data compiling and sharing practices, companies can purchase mailing lists from Rodale that identify Rodale subscribers by their most intimate details: income, political affiliation, religious practice, charitable donations, and even medical conditions. Rodale's disclosure of such sensitive and personal information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers. For example, Rodale will sell—to anyone willing to pay for it—a list with the names and addresses of all single, *Prevention* subscribers over age 80, who own homes, suffer from arthritis, and donate to international aid groups.

42.     Rodale discloses this information without subscriber consent, and its subscribers remain unaware that their Personal Reading Information and other sensitive personal information is being bought and sold on the open market.

43.     Consumers can sign up for Rodale subscriptions through numerous media outlets, including the Internet, telephone, or traditional mail. Regardless of how the consumer subscribes, Rodale never requires the individual to read or agree to any terms of service, privacy policy, or information-sharing policy. Consequently, Rodale uniformly fails to obtain any form of consent from—or even

provide effective notice to—its subscribers before disclosing their Personal
Reading Information.

44.     As a result, Rodale disclosed and continues to disclose its customers'
Personal Reading Information—including their reading habits and preferences that
can "reveal intimate facts about our lives, from our political and religious beliefs to
our health concerns"[19]—to anybody willing to pay for it, without consent and in
direct violation of the VRPA and in breach of its contracts with Plaintiff and the
other Class members.

### FACTS RELATING TO PLAINTIFF ROSE COULTER-OWENS

45.     Plaintiff Rose Coulter-Owens is a citizen of the State of Michigan.

46.     Coulter-Owens currently subscribes to *Prevention*.

47.     *Prevention* is a magazine published, owned, and operated by Rodale.

48.     Coulter-Owens has never agreed to allow Rodale to sell or disclose
her Personal Reading Information to anyone.

49.     Coulter-Owens did not receive notice before Rodale sold and
disclosed her Personal Reading Information.

50.     However, beginning on the date that Coulter-Owens subscribed to
*Prevention*, and continuing to the present, Rodale has disclosed, and continues to

---

[19]     *See California's Reader Privacy Act Signed into Law*, Electronic Frontier
Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last
visited Mar. 14, 2013).

disclose, without consent or prior notice, Coulter-Owens's Personal Reading

Information (*i.e.*, information that identifies Coulter-Owens as a *Prevention*

subscriber) to data mining companies including Acxiom, Ethnic Technologies, and

others, who then supplement that information with data from their own files.

51.    Furthermore, during that same time period, Rodale has sold—and

continues to sell and offer for sale—mailing lists containing Coulter-Owens's

Personal Reading Information to third parties including direct-mail advertisers as

well as organizations soliciting monetary contributions, volunteer work, and votes,

without first obtaining Coulter-Owens's written consent or even giving her prior

notice of the sales.

52.    Because Rodale sold and disclosed her Personal Reading Information,

she now receives a deluge of junk mail and telephone solicitations. These

unwanted offers waste her time, money, and resources, and cause her emotional

distress, including irritation, annoyance, and anxiety and fear that her personal

information will fall into the hands of thieves and scammers. This increase in

harassing junk mail and phone calls received by Coulter-Owens is attributable, in

part, to Rodale's sale of her Personal Reading Information.

53.    Additionally, because Coulter-Owens is entitled by law to privacy in

her Personal Reading Information, and because she paid money for her *Prevention*

subscription, Rodale's sale of her Personal Reading Information deprived her of

the full set of benefits to which she was entitled as part of her *Prevention* subscription, thereby causing her economic harm.

54.    Accordingly, what Coulter-Owens received (a subscription without privacy protections) was less valuable than what she paid for (a subscription with accompanying privacy protections), and she would not have been willing to pay as much, if at all, for her *Prevention* subscription had she known that Rodale would disclose her Personal Reading Information.

## CLASS ALLEGATIONS

55.    **Class Definition**: Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) on behalf of herself and a proposed Class, defined as follows:

> All Michigan residents who had their Personal Reading Information disclosed to third parties by Rodale without consent.

Excluded from the Class are (1) Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or their parents have a controlling interest and their current and former employees, officers, and directors, (2) the Judge or Magistrate Judge to whom this case is assigned and the Judge's or Magistrate Judge's immediate family, (3) persons who execute and file a timely request for exclusion, (4) all persons who have previously had claims similar to those alleged herein finally adjudicated or who have released their

17

claims against Defendant, and (5) the legal representatives, successors, or assigns of any such excluded person.

56.     **Numerosity**: The exact number of Class members is unknown to Plaintiff at this time, but it is clear that individual joinder of each class member is impracticable. Defendant has deceived, and profited from selling the Personal Reading Information of, thousands of consumers who fall into the definition set forth above. Ultimately, members of the Class will be easily identified through Defendant's records.

57.     **Commonality and Predominance**: Common questions of law and fact exist as to all members of the Class, and they predominate over any questions affecting only individual members. Those questions with respect to the Class include, but are not limited to:

    (a)     Whether Rodale is "engaged in the business of selling at retail" books or other written materials (*i.e.*, magazines);

    (b)     Whether Rodale obtained consent from Plaintiff and the Class before disclosing their Personal Reading Information to third parties;

    (c)     Whether Rodale's disclosure of Plaintiff's and the Class's Personal Reading Information violated the VRPA;

(d)     Whether Rodale's disclosure of Plaintiff's and the Class's

Personal Reading Information constitutes a breach of contract;

and

(e)     Whether Rodale's sale and disclosure of Plaintiff's and the

Class's Personal Reading Information constitutes unjust

enrichment.

58.     **Typicality**: Plaintiff's claims are typical of the claims of the other

Class members. Plaintiff and the Class sustained damages as a result of

Defendant's uniform wrongful conduct based upon Defendant's disclosure of

Plaintiff's and the Class's Personal Reading Information.

59.     **Adequate Representation**: Plaintiff will fairly and adequately

represent and protect the interests of the Class, and has retained counsel competent

and experienced in complex litigation and class actions. Plaintiff has no interests

antagonistic to those of the Class, and Defendant has no defenses unique to

Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this

action on behalf of the Class members, and have the financial resources to do so.

Neither Plaintiff nor her counsel has any interest adverse to those of the other Class

members.

60.     **Policies Generally Applicable to the Class**: This class action is

appropriate for certification because Defendant has acted or refused to act on

grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's practices challenged herein apply to and affect the Class members uniformly, and Plaintiff's challenge to those practices hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

61.   **Superiority**: Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all Class members is impracticable. The damages suffered by the individual Class members will likely be small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the Class members to obtain effective relief from Defendant's misconduct on an individual basis. Even if Class members could sustain individual litigation, it would not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a

single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

62.     Plaintiff reserves the right to revise the definition of the Class as necessary based upon information learned in discovery.

## FIRST CAUSE OF ACTION
### Violation of the Video Rental Privacy Act
### (M.C.L. § 445.1712)
### (On Behalf of Plaintiff and the Class)

63.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

64.     Rodale sells magazine subscriptions, print and digital copies of individual magazine issues, as well as books and videos, directly to consumers. Therefore, Rodale is engaged in the business of selling books or other written materials, and videos, at retail. *See* M.C.L. § 445.1712.

65.     By subscribing to *Prevention*, Plaintiff purchased written materials directly from Rodale. *See* M.C.L. § 445.1712.

66.     Because Plaintiff purchased written materials directly from Rodale, she is a "customer" within the meaning of the VRPA. *See* M.C.L. § 445.1711(a).

67.     At all times relevant, and beginning on the dates Plaintiff initiated her *Prevention* subscription, Rodale disclosed Plaintiff's Personal Reading Information, which identified her as a *Prevention* subscriber, in at least two ways.

68.     First, Rodale disclosed mailing lists containing Plaintiff's Personal Reading Information to data mining companies such as Acxiom, Ethnic Technologies, and others, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to Rodale.

69.     Second, Rodale sold its mailing lists containing Plaintiff's Personal Reading Information—enhanced with additional information from data miners—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes.

70.     Because the mailing lists included the additional information from the data miners, the lists were more valuable, and Rodale was able to increase its profits gained from the mailing list sales.

71.     By selling or otherwise disclosing its subscriber lists, Rodale disclosed to persons other than Plaintiff records or information concerning her purchase of written materials from Rodale. *See* M.C.L. § 445.1712.

72.     The information Rodale disclosed indicates Plaintiff's name and address, as well as the fact that she subscribed to *Prevention*. Accordingly, the records or information disclosed by Rodale indicate Plaintiff's identity. *See* M.C.L. § 445.1712.

73.     Plaintiff never consented to Rodale disclosing their Personal Reading Information to anyone.

74.     Worse yet, Plaintiff did not receive notice before Rodale's disclosed their Personal Reading Information to third parties.

75.     On information and belief, Rodale's disclosures of Plaintiff's Personal Reading Information were not made pursuant to a court order, search warrant, or grand jury subpoena.

76.     Rodale's disclosures of Plaintiff's Personal Reading Information were not made to collect payment for their subscriptions.

77.     Rodale's disclosures of Plaintiff's Personal Reading Information were made to data miners, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes—all in order to increase Rodale's revenue. Accordingly, Rodale's disclosures were not made for the exclusive purpose of marketing goods and services directly to Plaintiff.

78.     By disclosing Plaintiff's Personal Reading Information, Rodale violated Plaintiff's common law right to privacy.

79.     By disclosing Plaintiff's Personal Reading Information, Rodale violated Plaintiff's statutorily-protected right to privacy in their reading habits. *See* M.C.L. § 445.1712.

80.     Additionally, because Plaintiff and the Class paid for their Rodale subscriptions, and Rodale was obligated to comply with the VRPA, Rodale's unlawful disclosure of Plaintiff's and the other Class members' Personal Reading Information deprived Plaintiff and the Class members of the full value of their paid-for subscriptions. Because Plaintiff and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, Rodale's unlawful sale and disclosure of their Personal Reading Information caused her to receive less value than she paid for, thereby causing her economic harm.

81.     Likewise, because Plaintiff and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, a magazine subscription that keeps their Personal Reading Information private is more valuable than one that does not.

82.     Accordingly, had Plaintiff been adequately informed of Rodale's disclosure practices, she would not have been willing to purchase her *Prevention* subscription at the price charged, if at all. Thus, Rodale's unlawful disclosures caused Plaintiff economic harm.

83.     Rodale's disclosure of Plaintiff's Personal Reading Information to third parties has also caused an influx of third party print advertisements and marketing calls to her cellular phone, causing emotional distress in the form of irritation, aggravation, anxiety, and fear that her information will be obtained and

misused by thieves and scammers, as well as damages in the form of decreased available cellular phone minutes.

84.     As a result of Rodale's unlawful and continued disclosure of their Personal Reading Information, Plaintiff and the other Class members have suffered privacy and economic injuries. On behalf of herself and the Class, Plaintiff seeks: (1) an injunction requiring Defendant Rodale to obtain consent from Michigan subscribers prior to the disclosure of their Personal Reading Information as required by the VRPA; (2) actual damages, including disgorgement, or $5,000.00, whichever is greater, per Class member pursuant to M.C.L. § 445.1715(a); and (3) costs and reasonable attorneys' fees pursuant to M.C.L. § 445.1715(b).

<u>SECOND CAUSE OF ACTION</u>
**Breach of Contract**
**(On Behalf of Plaintiff and the Class)**

85.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

86.     Rodale offered to sell magazine subscriptions to Coulter-Owens and the other Class members for specific prices.

87.     Coulter-Owens and the other Class members accepted Rodale's offers by agreeing to pay the offered prices as consideration for purchasing the magazine subscriptions.

88.     Accordingly, Rodale, on the one hand, and Coulter-Owens and the other Class members on the other, entered into binding contracts for magazine subscriptions.

89.     Because the laws existing at the time and place of the making of a contract are incorporated into it, the contracts between Rodale and Coulter-Owens and the other Class members included obligations for the parties to abide by all applicable laws, including the VRPA.

90.     Coulter-Owens and the other Class members performed their obligations under the contracts by paying the consideration owed to Rodale for the purchase of their magazine subscriptions, and by complying with all applicable laws.

91.     The ability to control disclosure of sensitive personal information (such as Personal Reading Information) is material to any consumer transaction because it is likely to affect a consumer's decision to, or conduct regarding, purchase of a product or service.

92.     Rodale's failure to perform its contractual obligations imposed by the VRPA—*i.e.*, maintaining confidentiality of subscribers' Personal Reading Information—constitutes a material breach by Rodale of its contracts with Coulter-Owens and the other Class members.

93.     Plaintiff and the other Class members have suffered actual damages as a result of Rodale's breach in the form of the value Coulter-Owens and the other Class members paid for and ascribed to the confidentiality of their Personal Reading Information. This amount is tangible and will be calculated at trial.

94.     Further, a portion of the purchase price of each Rodale subscription sold to Plaintiff and the other Class members was intended to ensure the confidentiality of Plaintiff's and the other Class members' Personal Reading Information, as required by the VRPA. Because Plaintiff and the other Class members were denied services that they paid for and were entitled to receive—*i.e.*, confidentiality of their Personal Reading Information—they incurred actual monetary damages.

95.     Additionally, because Rodale profited from its breach, Plaintiff and the other Class members are entitled to disgorgement of all profits obtained by Rodale from its unlawful disclosure of its subscribers' Personal Reading Information.

96.     Accordingly, Plaintiff and the other Class members seek an order declaring that Rodale's conduct constitutes breach of contract, and awarding Plaintiff and the Class disgorgement of Rodale's unlawfully obtained profits, and damages in an amount to be calculated at trial.

## THIRD CAUSE OF ACTION
**Unjust Enrichment**
**(In the Alternative to Breach of Contract)**
**(On Behalf of Plaintiff and the Class)**

97.    Plaintiff incorporates the allegations contained in paragraphs 1 through 84 as if fully set forth herein.

98.    Plaintiff's claim for unjust enrichment is brought in the alternative to her claim for breach of contract.

99.    Plaintiff and the Class members conferred benefits on Rodale by providing Rodale with their Personal Reading Information and paying Rodale for their magazine subscriptions. Rodale received and retained the information and money belonging to Plaintiff and the Class when Plaintiff and the Class subscribed to Rodale publications.

100.   Because Rodale received and processed Plaintiff's and the Class's subscription payments and Personal Reading Information, and because Rodale has employees handling customer accounts and billing as well as customer data, Rodale appreciates or has knowledge of such benefits.

101.   Under the VRPA, Plaintiff and the Class members were entitled to confidentiality in their Personal Reading Information as part of their subscriptions.

102.   Under principles of equity and good conscience, because Rodale failed to comply with the VRPA, Rodale should not be allowed to retain the full

amount of money Plaintiff and the Class paid for their subscriptions or the money it received by selling Plaintiff's and the Class's Personal Reading Information.

103.   Plaintiff and the other Class members have suffered actual damages as a result of Rodale's unlawful conduct in the form of the value Plaintiff and the other Class members paid for and ascribed to the confidentiality of their Personal Reading Information. This amount is tangible and will be calculated at trial.

104.   Additionally, Plaintiff and the Class members have suffered actual damages inasmuch as Rodale's failure to inform them that it would disclose their Personal Reading Information caused them to purchase magazine subscriptions when they otherwise would not have.

105.   Further, a portion of the purchase price of each Rodale magazine subscription sold to Plaintiff and the other Class members was intended to ensure the confidentiality of Plaintiff's and the other Class members' Personal Reading Information, as required by the VRPA. Because Plaintiff and the other Class members were denied services that they paid for and were entitled to receive—*i.e.*, confidentiality of their Personal Reading Information—and because Plaintiff and the Class would have commanded a discount to voluntarily forego those benefits, they incurred actual monetary damages.

106.   To prevent inequity, Rodale should return to Plaintiff and the Class the value they ascribe to confidentiality of their Personal Reading Information and

all money derived from Rodale's sale and disclosure of Plaintiff's and the Class's Personal Reading Information.

107.   Accordingly, Plaintiff and the Class members seek an order declaring that Rodale's conduct constitutes unjust enrichment, and awarding Plaintiff and the Class restitution in an amount to be calculated at trial equal to the amount of money obtained by Rodale through its sale and disclosure of Plaintiff's and the Class's Personal Reading Information.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Rose Coulter-Owens, on behalf of herself and the Class, prays that the Court enter judgment in her favor and against Rodale and for the following relief:

(1)   Certify the Class as defined above, appoint Plaintiff as Class Representative, and designate her counsel as Class Counsel;

(2)   Declare that Rodale's conduct as described herein violates the Video Rental Privacy Act, M.C.L. § 445.1712;

(3)   Declare that Rodale's conduct as described herein constitutes breach of contract, or in the alternative, unjust enrichment;

(4)   Award actual damages, including disgorgement and restitution, or $5,000, whichever is greater, to Plaintiff and each Class member, as provided by the Video Rental Privacy Act, M.C.L. § 445.1715(a);

(5)   Award injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Rodale to cease the unlawful disclosures discussed herein;

    (6)      Award reasonable attorneys' fees, interest and costs, M.C.L. § 445.1715(b); and

    (7)      Such other and further relief as the Court deems equitable and just.

### DEMAND FOR TRIAL BY JURY

Plaintiff request trial by jury of all claims that can be so tried.

Respectfully submitted,

**ROSE COULTER-OWENS**, individually and on behalf of all others similarly situated,

Dated: July 9, 2014

By: /s/ J. Dominick Larry
       One of Plaintiff's Attorneys

Ari J. Scharg
ascharg@edelson.com
J. Dominick Larry
nlarry@edelson.com
David I. Mindell*
dmindell@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Henry M. Scharg – P28804
hmsattyatlaw@aol.com
LAW OFFICE OF HENRY M. SCHARG
718 Ford Building
Detroit, Michigan 48226
Tel: 248.596.1111
Fax: 248.671.0335

*Admission to be sought.

31